# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN PATRICK DURAN, | ) Case No. CV 16-7416-JPR |
| | ) |
| Plaintiff, | ) |
| | ) **MEMORANDUM DECISION AND ORDER** |
| v. | ) **AFFIRMING COMMISSIONER** |
| | ) |
| NANCY A. BERRYHILL, Acting | ) |
| Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |
| ——————————————— | ) |

## I.  PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying his applications for Social Security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Stipulation, filed April 17, 2017, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed.

## II.  BACKGROUND

Plaintiff was born in 1980.  (Administrative Record ("AR") 68.)  He completed 10th grade (AR 29), received his high-school diploma while in juvenile detention (id.), and worked as a commercial driver, general laborer, and security guard (AR 244).

On October 10, 2012, Plaintiff filed applications for DIB and SSI, alleging in each that he had been unable to work since July 31, 2009, because of Tourette's syndrome, attention deficit hyperactivity disorder, obsessive compulsive disorder, and bipolar disorder.  (AR 68, 83.)  After his applications were denied initially and on reconsideration (AR 98-99, 128-29), he requested a hearing before an Administrative Law Judge (AR 145).  A hearing was held on February 26, 2015, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert and medical expert.  (AR 26-67.)  In a written decision issued April 20, 2015, the ALJ found Plaintiff not disabled.  (AR 8-21.)  Plaintiff requested review from the Appeals Council, and on September 14, 2016, it denied review.  (AR 1-3.)  This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at

401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).
It is more than a scintilla but less than a preponderance.
Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether
substantial evidence supports a finding, the reviewing court
"must review the administrative record as a whole, weighing both
the evidence that supports and the evidence that detracts from
the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715,
720 (9th Cir. 1996).  "If the evidence can reasonably support
either affirming or reversing," the reviewing court "may not
substitute its judgment" for the Commissioner's.  Id. at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or has lasted, or is expected to
last, for a continuous period of at least 12 months.  42 U.S.C.
§ 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.
1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to
assess whether a claimant is disabled.  20 C.F.R.
§§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821,
828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first
step, the Commissioner must determine whether the claimant is
currently engaged in substantial gainful activity; if so, the
claimant is not disabled and the claim must be denied.
§§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and his claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform his past work; if so, he is not disabled and the claim must be denied. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

substantial gainful work available in the national economy.
§§ 404.1520(a)(4)(v), 416.920(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257.
That determination comprises the fifth and final step in the
sequential analysis.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v);
<u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B.    <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since July 31, 2009, the alleged
onset date.  (AR 13.)  At step two, she concluded that Plaintiff
had severe impairments of history of ADHD, history of anxiety,
and personality disorder.  (<u>Id.</u>)  At step three, she determined
that Plaintiff's impairments did not meet or equal a listing.
(AR 14.)

At step four, the ALJ found that Plaintiff had the RFC to
perform a full range of work at all exertional levels, but she
limited him to "simple, repetitive tasks with no fast-paced
assembly line work, no teamwork, no public contact, and no more
than occasional contact with co-workers and supervisors."  (AR
15.)

Based on the VE's testimony, the ALJ concluded that
Plaintiff could not perform his past relevant work.  (AR 19-20.)
At step five, she relied on the VE's testimony to find that given
Plaintiff's RFC for work at all exertional levels "compromised by
nonexertional limitations," he could perform three
"representative" unskilled occupations in the national economy.
(AR 20-21.)  Accordingly, she found Plaintiff not disabled.  (AR
21.)

**V.   DISCUSSION**

Plaintiff argues that the ALJ erred in (1) considering and evaluating the opinions of Drs. Robert Marselle and Charles Dalton and failing to incorporate portions of them into his RFC and (2) assessing the credibility of his subjective symptom statements.  (See J. Stip. at 2.)[2]

A.   The ALJ Properly Assessed the Medical Evidence and Determined Plaintiff's RFC

Plaintiff contends that the ALJ failed to properly consider and evaluate Dr. Marselle's opinion that (1) he "needed special and extra time," (2) "at times even simple instructions would be problematic for him," and (3) he had moderate limitations in his ability to maintain regular workplace attendance, perform work activities on a consistent basis, and perform work activities without special or additional supervision.  (Id. at 5.) Plaintiff also argues that the ALJ erred in failing to include in his RFC Dr. Dalton's purported opinion that he would "miss days off work," "be off task during the workday about 15-20%" of the time, and  "need special or additional supervision occasionally." (Id. at 6.)  For the reasons discussed below, remand is not

---

[2] Plaintiff also contends that the ALJ's hypothetical to the VE was incomplete and she therefore erred in relying on the VE's testimony.  (J. Stip. at 2, 11-13); see Hill v. Astrue, 698 F.3d 1153, 1162 (9th Cir. 2012) (if hypothetical to VE does not reflect all of claimant's limitations, then VE's testimony "has no evidentiary value to support a finding that the claimant can perform jobs in the national economy" (citation omitted)).  As explained in Section V.A., the ALJ's RFC determination adequately incorporated Plaintiff's mild to moderate limitations.  Because the ALJ's hypothetical to the VE included the same limitations as those in the RFC determination, she properly relied on the VE's testimony in finding Plaintiff capable of performing other work.

warranted.

### 1. Applicable law

A claimant's RFC is "the most [he] can still do" despite the impairments and related symptoms that "may cause physical and mental limitations that affect what [he] can do in a work setting." §§ 404.1545(a)(1), 416.945(a)(1). A district court must uphold an ALJ's RFC assessment when the ALJ has applied the proper legal standard and substantial evidence in the record as a whole supports the decision. <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1217 (9th Cir. 2005). The ALJ must consider all the medical opinions "together with the rest of the relevant evidence [on record]." §§ 404.1527(b), 416.927(b);[3] <u>see also</u> §§ 404.1545(a)(1), 416.945(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those

---

[3] Social Security regulations regarding the evaluation of opinion evidence were amended effective March 27, 2017. When, as here, the ALJ's decision is the final decision of the Commissioner, the reviewing court generally applies the law in effect at the time of the ALJ's decision. <u>See</u> <u>Lowry v. Astrue</u>, 474 F. App'x 801, 805 n.2 (2d Cir. 2012) (applying version of regulation in effect at time of ALJ's decision despite subsequent amendment); <u>Garrett ex rel. Moore v. Barnhart</u>, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final."); <u>Spencer v. Colvin</u>, No. 15-05925, 2016 WL 7046848, at *9 n.4 (W.D. Wash. Dec. 1, 2016) ("42 U.S.C. § 405 does not contain any express authorization from Congress allowing the Commissioner to engage in retroactive rulemaking"). Accordingly, citations to 20 C.F.R. §§ 404.1527 and 416.927 are to the version in effect from August 24, 2012 to March 26, 2017.

who did neither.  Lester, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's.  Id.; see §§ 404.1527(c)(1), 416.927(c)(1).

This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  But "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings."  Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam).  Further, greater weight may be given to a nonexamining doctor who testifies at a hearing and is subject to cross-examination.  Andrews v. Shalala, 53 F.3d 1035, 1042 (9th Cir. 1995).

In making an RFC determination, the ALJ should consider those limitations for which there is support in the record and need not take into account properly rejected evidence or subjective complaints.  See Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC determination because "the ALJ took into account those limitations for which there was record support that did not depend on [claimant]'s subjective complaints"); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ not required to incorporate into RFC those findings from physician opinions that were "permissibly discounted").  The ALJ considers findings by state-agency medical consultants and experts as opinion evidence.  §§ 404.1527(e), 416.927(e).  Medical-source opinions on ultimate issues reserved to the Commissioner, such as

8

a claimant's RFC or the application of vocational factors, are not medical opinions and have no special significance. §§ 404.1527(d), 416.927(d).

Furthermore, "[t]he ALJ need not accept the opinion of any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson, 359 F.3d at 1195. An ALJ need not recite "magic words" to reject a physician's opinion or a portion of it; the court may draw "specific and legitimate inferences" from the ALJ's opinion. Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989). "[I]n interpreting the evidence and developing the record, the ALJ does not need to 'discuss every piece of evidence.'" Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (quoting Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)).

The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "'evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

> 2.  Relevant background

Consulting psychologist Dr. Robert Marselle performed a comprehensive psychological examination and evaluation of Plaintiff on March 26, 2013. (See AR 383-92.) Dr. Marselle noted that Plaintiff lived with his mother; was able to dress and bathe himself and care for his own personal hygiene; was unable

to drive but could take the bus;[4] had no "outside activities"; was able to pay bills and handle money appropriately but had difficulty with calculations; was able to go out alone; reported "fair" relationships with family and friends; could not "focus attention during the interview"; had difficulty completing household tasks and making decisions; and got up early, showered, got dressed, and looked for employment "on a daily basis." (AR 385-86.)

In a mental-status examination, Plaintiff appeared "genuine and truthful"; Dr. Marselle noted that there was "no evidence" of exaggeration or manipulation. (AR 386.) Plaintiff's thought processes were coherent and organized; his thought content was not delusional, bizarre, or psychotic; his mood and affect were "within normal limits," although he admitted to "feelings of hopelessness" and "helplessness"; his speech was normal; he had low-average intelligence but was completely alert and oriented; and his abstract thinking, judgment, and insight all appeared intact. (AR 386-88.) Plaintiff had "significant problems" with attention, focus, and short-term memory, however. (AR 388.)

Plaintiff's performance in a series of psychological tests indicated that he was "functioning in the borderline range of intelligence" and had "memory dysfunction," his "short-term memory showed significant delay," and he was "far below average" in the areas of "sustained attention, visual search, and psychomotor efficiency." (AR 389-90.) Dr. Marselle assessed

---

[4] At the hearing, Plaintiff clarified that he had a driver's license and could drive but that his mother would not let him use her car. (AR 55.)

Plaintiff as having ADD, "sociopathic personality traits," and a current global assessment of functioning score of 74.[5]  (AR 390.) He noted that Plaintiff's prognosis was "good."  (AR 391.)  In the "Discussion of Allegations" section of the evaluation, Dr. Marselle noted that Plaintiff's ADD was a "lifelong problem" that gave him "great difficulty," and "[i]t is unlikely that he would be able to follow more complex instructions and at times even simple instructions would be problematic for him."  (AR 390.)

In the "Functional Assessment" portion of the report, Dr. Marselle opined that Plaintiff had "mild" restrictions in his ability to "understand, remember, and carry out <u>simple</u> one-or two-step job instructions" and "moderate" restrictions in following "detailed and <u>complex</u> instructions."  (AR 391 (emphases in original).)  He had "mild" restrictions in his ability to "maintain concentration and attention, persistence and pace" and accept instructions from supervisors.  (<u>Id.</u>)  He had no restrictions in his ability to "relate and interact with co-workers and [the] public" or "associate with day-to-day work activity, including attendance and safety."  (<u>Id.</u>)  In his ability to "maintain regular attendance in the workplace and perform work activities on a consistent basis" and "perform work activities without special or additional supervision," Dr.

---

[5] GAF scores assess a person's overall psychological functioning on a scale of 1 to 100.  <u>See</u> <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32 (revised 4th ed. 2000). A GAF score of 71-80 indicates "no more than slight impairment" in social, occupational, or school functioning.  <u>DSM-IV</u> 34.  GAF scores have been excluded from the latest edition of DSM because of concerns about their reliability and lack of clarity, however. <u>See</u> <u>DSM-V</u> 15-16 (5th ed. 2013).

Marselle opined that Plaintiff had "moderate" restrictions "due to inattentiveness." (Id.)

On May 10, 2013, state-agency medical consultant Dr. Barbara Moura[6] completed the psychiatric portion of the disability determination for Plaintiff's SSI and DIB claims. (AR 68-74, 76-80, 83-90, 92-95.) After reviewing the medical evidence, which included Dr. Marselle's report, Dr. Moura opined that Plaintiff's "primary disorder" was ADHD, which caused mild restrictions in his activities of daily living and moderate restrictions in maintaining social functioning and concentration, persistence, or pace. (AR 69, 73.) She noted that Plaintiff had a history of hospitalization for "depression and acting out" as a teenager but apparently no record of hospitalization as an adult. (AR 73.) Dr. Moura noted Dr. Marselle's opinion that Plaintiff's "attentional" difficulties would likely interfere with "even simple tasks" at times; she noted that later in his report, however, Dr. Marselle assessed "at most moderate limitations" and "mild limitations" in Plaintiff's concentration, persistence, and pace. (AR 74.) Dr. Moura concluded that Dr. Marselle's opinion that Plaintiff would have problems with "simple tasks" was "inconsistent" with the rest of his report. (Id.) She found that Plaintiff would have "marked limitations" performing complex tasks; "moderate limitations" maintaining concentration, persistence, and pace; and "possibly moderate limitations"

_____

[6] Dr. Moura's signature line includes a medical-consultant code of "38," indicating "[p]sychology" (AR 74); see Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 5, 2015), https://secure.ssa.gov/poms.nsf/lnx/0424501004.

interacting with the public.  (Id.)

    In her mental-RFC assessment, Dr. Moura opined that although
Plaintiff had understanding and memory limitations that would
"markedly limit[]" his ability to understand and remember
detailed instructions, he had no significant limitation in his
ability to "remember locations and work-like procedures" or
"understand and remember very short and simple instructions."
(AR 77-78.)  He had moderate limitations in his ability to
maintain attention and concentration for extended periods of
time; sustain an ordinary routine without special supervision;
work in coordination with or in proximity to others without being
distracted by them; and complete a normal workday and workweek
without interruption from psychologically based symptoms and
perform at a consistent pace without an unreasonable number and
length of rest periods.  (Id.)  He had no significant limitations
in his ability to make simple work-related decisions or perform
activities within a schedule, maintain regular attendance, and be
punctual within customary tolerances.  (Id.)  Other than moderate
limitation in his ability to interact appropriately with the
general public and respond appropriately to changes in the work
setting, Plaintiff had no significant limitations in the areas of
social interaction or adaptation.  (AR 78-79.)  Dr. Moura opined
that Plaintiff should be limited to "simple 1-2 step tasks,"
could work a regular workweek or workday with "customary breaks,"
and could interact "appropriately" with peers and supervisors but
must have "limited" contact with the public.  (AR 79.)  She noted
that Dr. Marselle's opinion contained some internal
inconsistencies, was "an overestimate of the severity of

13

[Plaintiff]'s restrictions/limitations and [was] based only on a snapshot of [Plaintiff]'s functioning." (AR 79-80.)

On September 20, 2013, state-agency medical consultant Dr. Junko McWilliams, a psychologist, completed the psychiatric portion of the disability determination for Plaintiff's SSI and DIB claims on reconsideration. (AR 104-08, 109-11.) Dr. McWilliams noted that Plaintiff had "reported no psychiatric changes" or treatment since Dr. Moura's initial assessment. (AR 105.) He agreed with Dr. Moura's assessment of Plaintiff's limitations (AR 106) and with her mental-RFC assessment (AR 109-10), except that he found no significant limitation in Plaintiff's ability to sustain an ordinary routine without special supervision or work in coordination with or in proximity to others without being distracted by them (AR 110), and he found moderate limitation in his ability to accept instructions, respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes (id.). Dr. McWilliams noted that Plaintiff's concentration limitations "do not preclude him from performing the basic mental demands of competitive work" on a regular basis, he could "deal with the public and get along with people at work if the contact is brief," and he could "adapt to changes if they are not too rapid and extensive." (AR 110-11.)

Dr. Charles Dalton, a clinical psychologist, testified telephonically as a medical expert at Plaintiff's hearing. (AR 31-43.) Dr. Dalton reviewed the medical record and determined that Plaintiff had "no more than mild limitations and adaptive functions," "no more than moderate limitations in socialization,

14

including the ability to get along with colleagues and supervisors," and "no more than moderate limitations in concentration, persistence[,] or pace." (AR 32.) Based on Dr. Marselle's report, Dr. Dalton opined that Plaintiff's "intellectual functioning appears to be adequate for simple tasks and work." (Id.) Dr. Dalton opined that Plaintiff would need to be restricted to occasional contact with the public and "others." (AR 32-33.)

Plaintiff's attorney extensively questioned Dr. Dalton at the hearing. (See AR 33-43.) As to Dr. Dalton's opinion that Plaintiff had "moderate" impairment in concentration, persistence, and pace, counsel asked whether Plaintiff "would be off task" for some percentage of the day (AR 33-34); Dr. Dalton responded:

> It would depend on what the task is. If it's bagging
> groceries, probably not. If it's pulling things off an
> assembly line, probably not. So for very simple,
> repetitive tasks, no. For more detailed tasks, things
> that would include two and three steps, probably for some
> percentage of the day, yes.

(AR 34). When pushed by the attorney on the subject, Dr. Dalton stuck to his position that Plaintiff would not be significantly off-task:

> Q: Would it be reasonable that the Claimant's
> attendance would be impaired, to the point, where
> he would miss, let's say, two or three days a month
> from work, based on this moderate restriction?
> A: No. There's no previous history supporting that

15

conclusion. A person who would be missing that much work, would have significant other personal deficits that he would require psychiatric treatment . . .

Q: What is the impact of a moderate restriction on ability to maintain regular attendance in the workplace? Would his attendance suffer because of this restriction and if so, to what degree?

. . .

A: I don't -- I can't quantify that. There's just such limits of data here. Without a psychiatric treatment history, I would assume that it would not be so significant, as to keep him from doing SGA, any gainful employment. I would say no more less than 15 to 20% . . . . And so you're asking for quantification and I can't give it.

(AR 38-39.) Counsel again asked Dr. Dalton to quantify, in percentage of time, the impact of "moderate" restrictions in Plaintiff's ability to maintain regular attendance in the workplace (AR 39) and to perform work activities without special or additional supervision (AR 40), and Dr. Dalton responded that he was unable to do so (AR 39, 41). The ALJ interrupted counsel's questioning, noting that counsel was likely not "going to get [Dr. Dalton] to quantify any more than he has." (AR 41.)

When asked about Dr. Marselle's opinion that "at times" Plaintiff might "have difficulty performing even simple instructions," Dr. Dalton pointed out that Dr. Marselle "goes on to say" that Plaintiff had only mild restrictions in his ability

16

to understand and carry out simple instruction. (AR 34.) Dr.
Dalton noted that Dr. Marselle's opinion that Plaintiff had only
mild restrictions in that area was "consistent with the objective
data." (Id.) When asked about Plaintiff's memory impairment,
Dr. Dalton opined that, although "there are memory impairments,"
Plaintiff's memory-test scores were "indicative of poor effort."
(AR 35.) Noting that "[a] raw score of zero" and
"inconsistencies" between scores were indicative of poor or
limited effort, Dr. Dalton suggested that Dr. Marselle's
assessment of only mild limitations in memory for simple tasks
"gives you insight, as to how he took into consideration"
Plaintiff's low memory-test scores. (AR 36.) He suggested that
that assessment "speaks just as much as" Dr. Marselle's
statements concerning Plaintiff's effort and sincerity. (Id.)
Dr. Dalton opined that "[a]s tasks become more complex, yes,
there are probably going to be moderate memory impairments" (AR
35), but that Plaintiff had no "significant impairments, memory,
concentration or attention for simple instructions" (AR 37),
there was no medical history supporting a conclusion that he
would miss two or three days a month from work based on his
limitations (AR 38), and he would not need special or additional
supervision (AR 40).

When pushed to quantify Plaintiff's "moderate" restriction
in performing work activities without special or additional
supervision, Dr. Dalton stated that "[w]hereas, somebody might
need to be told instructions once, this person may need to be
told it twice." (AR 41.) Dr. Dalton opined that "[t]he fact
that [Plaintiff] has had no treatment since 1998 . . . says [his

17

diagnoses have] never been problematic enough [for him] to do anything about it." (AR 42.)

3. <u>Analysis</u>

Plaintiff argues that the ALJ erred in rejecting without explanation certain limitations assessed by Drs. Marselle and Dalton. (J. Stip. at 2-6, 9-10.) The ALJ limited Plaintiff to "simple, repetitive tasks with no fast-paced assembly line work, no teamwork, no public contact, and no more than occasional contact with co-workers and supervisors." (AR 15.) In assessing Plaintiff's mental impairments, she gave "great weight" to the opinions of state-agency consultants Drs. Moura and McWilliams, consulting psychologist Dr. Marselle, and medical expert Dr. Dalton. (AR 18.) She did not, however, adopt any of their opinions in full. (<u>See id.</u>)

The ALJ summarized Dr. Marselle's opinion, noting that the "broad consensus" among the psychologists who examined Plaintiff or reviewed his medical record was that he was "capable of performing at least simple work." (AR 17-18.) She gave "great weight" to the opinions of Drs. Moura, Marselle, McWilliams, and Dalton, which were "consistent with the record as a whole and with each other," and "greater weight" to the opinion of Dr. McWilliams that Plaintiff was "able to adapt to changes if they are not too rapid and extensive" and to the opinions of Drs. Moura, McWilliams, and Dalton that Plaintiff "should have limited interpersonal contact." (AR 18.) She found that Plaintiff's "restriction to simple work . . . more than adequately accommodates" his limitations. (<u>Id.</u>)

As an initial matter, the ALJ properly translated the mild

18

and moderate limitations assessed by Dr. Marselle into
Plaintiff's RFC.  Dr. Marselle found that Plaintiff had mild
restrictions in his ability to "understand, remember, and carry
out simple one-or two-step job instructions"; moderate
restrictions with "detailed and complex instructions"; mild
restrictions in his ability to "maintain concentration and
attention, persistence and pace" and accept instructions from
supervisors; and moderate restrictions in his ability to
"maintain regular attendance in the workplace and perform work
activities on a consistent basis" and "perform work activities
without special or additional supervision."  (AR 391.)  The ALJ
appropriately translated those mild and moderate restrictions
into Plaintiff's RFC for "simple, repetitive tasks" with
limitations on fast-paced work, teamwork, and contact with the
public, coworkers, and supervisors.  See Stubbs-Danielson v.
Astrue, 539 F.3d 1169, 1173-74 (9th Cir. 2008) (ALJ's limitation
to "simple, routine, repetitive" work sufficiently accommodated
medical-opinion evidence that claimant had "moderate" limitation
in pace and "other mental limitations regarding attention,
concentration, and adaption"); Hughes v. Colvin, 599 F. App'x
765, 766 (9th Cir. 2015) (ALJ's RFC assessment accounted for
moderate difficulties in social functioning, concentration, and
persistence by restricting claimant to simple, routine,
repetitive tasks in job where she could work independently, with
no more than occasional public interaction); Sabin v. Astrue, 337
F. App'x 617, 620-21 (9th Cir. 2009) (ALJ properly assessed
medical evidence in determining that despite moderate
difficulties in concentration, persistence, or pace, claimant

19

could perform simple and repetitive tasks on consistent basis); Rodriquez v. Colvin, No. 1:13-CV-01716-SKO, 2015 WL 1237302, at *6 (E.D. Cal. Mar. 17, 2015) ("a moderate limitation in the ability to complete a workday or workweek without interruption is consistent with and properly captured by a limitation to simple repetitive tasks"); McLain v. Astrue, No. SACV 10-1108 JC, 2011 WL 2174895, at *6 (C.D. Cal. June 3, 2011) ("[m]oderate mental functional limitations . . . are not per se disabling, nor do they preclude the performance of jobs that involve simple, repetitive tasks" (citations omitted)).

To the extent Dr. Marselle opined that Plaintiff might sometimes have difficulty even with simple tasks and might need extra or special supervision, the ALJ's reliance on the opinions of Drs. Moura, McWilliams, and Dalton — who each noted that that brief portion of Dr. Marselle's opinion must be read in the context of his finding of only mild and moderate limitations — was substantial evidence because those opinions were consistent with the medical evidence and indeed Dr. Marselle's own functional assessment. As the state-agency doctors observed, Dr. Marselle's brief assessment of possible occupational difficulty even with simple tasks was undermined by his other findings. In the "functional assessment" portion of his opinion, which comes after his examination notes, he assessed Plaintiff as having no more than moderate or mild limitations. (AR 391.) Indeed, Dr. Marselle assigned Plaintiff a GAF score of 74, indicating that he had "no more than slight impairment" in social, occupational, or school functioning, and he noted that his prognosis was "good." (AR 390-91); DSM-IV 34. As Dr. Dalton noted, Dr. Marselle's

opinion only made sense when read as a whole, not when brief
portions of it were considered in isolation.  Thus, the ALJ was
entitled to implicitly disregard Dr. Marselle's note that
Plaintiff might "at times" have difficulty with "even simple
instructions" because it was inconsistent with his own broader
assessment.  (AR 390); See Rollins v. Massanari, 261 F.3d 853,
856 (9th Cir. 2001) (ALJ permissibly rejected physician's opinion
when it was contradicted by or inconsistent with treatment
reports); Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003)
(physician's opinion properly rejected when treatment notes
"provide[d] no basis for the functional restrictions he opined
should be imposed on [plaintiff]"); see also Magallanes, 881 F.2d
at 755 (ALJ need not recite "magic words" to reject portion of
physician's opinion; court may draw "specific and legitimate
inferences" from ALJ's opinion).

     The ALJ was entitled to rely on the opinions of the
consulting and reviewing psychologists together, because they
were generally consistent with each other and with Dr. Marselle's
own functional assessment.  See Tonapetyan v. Halter, 242 F.3d
1144, 1149 (9th Cir. 2001) (although "contrary opinion of a
non-examining medical expert does not alone constitute a
specific, legitimate reason for rejecting a treating or examining
physician's opinion, it may constitute substantial evidence when
it is consistent with other independent evidence in the record");
Andrews, 53 F.3d at 1041 ("reports of the nonexamining advisor
need not be discounted and may serve as substantial evidence when
they are supported by other evidence in the record and are
consistent with it"); Morgan v. Comm'r, Soc. Sec. Admin., 169

F.3d 595, 600 (9th Cir. 1999) (testifying medical-expert opinions may serve as substantial evidence when "they are supported by other evidence in the record and are consistent with it").

Plaintiff further argues that the ALJ failed to incorporate portions of Dr. Dalton's opinion that Plaintiff would "miss days off work," "be off task during the workday about 15-20%" of the time, and "would need special or additional supervision occasionally." (J. Stip. at 6.) Dr. Dalton testified that Plaintiff had no more than mild or moderate functional limitations and opined that Plaintiff could perform "simple tasks." (AR 32.) As discussed above, the ALJ properly translated Plaintiff's moderate limitations in his ability to maintain workplace attendance and perform work without special or additional supervision into his RFC for "simple, repetitive tasks."

To the extent Plaintiff argues that Dr. Dalton testified that he would be "off task" "about 15-20%" of the time (see J. Stip. at 6), Plaintiff mischaracterizes that portion of Dr. Dalton's testimony. Dr. Dalton opined that "for very simple, repetitive tasks" Plaintiff would not be off task at all. (AR 34.) Further, Dr. Dalton repeatedly stated that he was not able to quantify Plaintiff's limitations and resisted Plaintiff's counsel's repeated attempts to ask him to do so. (See AR 39.) As for Dr. Dalton's statement that Plaintiff might need to be told some instructions "twice," it was clear in context that he was not referring to the simple, repetitive tasks the ALJ found Plaintiff capable of but rather more detailed instructions. (See AR 37 (stating that Plaintiff had no "significant impairments

. . . for simple instructions"); see also AR 38-41.)

Accordingly, Plaintiff is not entitled to remand on this ground.

B.   The ALJ Properly Assessed the Credibility of
     Plaintiff's Subjective Symptom Statements

Plaintiff argues that the ALJ failed to articulate legally sufficient reasons for rejecting his testimony. (J. Stip. at 13-18, 21-23.)  For the reasons discussed below, the ALJ did not err.

1.   Applicable law[7]

An ALJ's assessment of the credibility of a claimant's allegations concerning the severity of his symptoms is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the

---

[7] Social Security Ruling 16-3p, 2016 WL 1119029, effective March 28, 2016, rescinded SSR 96-7p, 1996 WL 374186 (July 2, 1996), which provided the framework for assessing the credibility of a claimant's statements.  SSR 16-3p was not in effect at the time of the ALJ's decision on April 20, 2015, however.

pain or other symptoms alleged." Id. at 1036. If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen, 80 F.3d at 1282 (emphasis in original).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if she makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014). The ALJ may consider, among other factors, (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); Thomas, 278 F.3d at 958-59. If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

## 2. Relevant background

Medical records from 1997 and 1998 reveal that Plaintiff was hospitalized several times as a teenager and placed on psychiatric hold. (See AR 360 (Aug. 1997 hospitalization), 350 (May 1998 hospitalization, noting that it was his "third").) In 1997 he "refused to take his medications" but later tolerated them "without side effects." (AR 360-61.) Although he showed side effects from some medication in 1998, when a different medication was prescribed instead he tolerated it well "without further side effects." (AR 351.) In a school report from October 1998, it was noted that Plaintiff's behavior was "definitely better" when he took his medication. (AR 402.)

In his consultative examination on March 26, 2013, Plaintiff told Dr. Marselle that he had problems focusing, remaining attentive, concentrating, and remembering. (AR 384.) He had a history of bipolar disorder, Tourette's syndrome, ADHD, and obsessive compulsive disorder, and he said he currently suffered from the latter two. (Id.) He reported that he had not been hospitalized or treated for psychiatric problems "other than in prison"[8] and was not currently taking any medication or receiving any treatment. (Id.) He reported that he typically spent his day "get[ting] up early, shower[ing], get[ting] dressed, and look[ing] for employment." (AR 386.) He had no problems with personal care, rode the bus, could pay bills and handle cash appropriately, and had fair relationships with family and friends. (AR 385.) He had difficulty completing household tasks

---

[8] As noted above, this apparently was not true.

25

and making decisions.  (AR 385-86.)

    At the February 26, 2015 hearing, Plaintiff testified that he was not seeing a doctor for his conditions (AR 31), was not taking any medication (AR 55), and had seen a doctor most recently "a few years" ago (id.).  He had been fired from several jobs because he failed to finish the tasks assigned to him, wasn't working fast enough, or "wasn't catching on" to the job. (AR 45-48.)  He testified that he had a hard time "just concentrating, getting certain jobs done, just getting [himself] together, just basic instructions."  (AR 52.)  He had to be "told over and over again, what to do" by his employers.  (Id.)  He could take the bus by himself, and in a normal day he would watch television, sleep, and go to the park to exercise.  (AR 53-54.) He could not finish a 30-minute television program without losing interest and changing the channel to watch something else.  (AR 54-55.)  He was able to maintain his living area but sometimes had trouble finishing that task because he got sidetracked.  (AR 56.)  He could make his own basic meals.  (Id.)  He noted that when he was taking medication, he "had a lot of bad side effects."  (Id.)  When asked by the ALJ why he had not seen a psychiatrist recently, Plaintiff stated that he had tried but could not "find one."  (AR 61.)  He noted that he "called a couple numbers" but was told that "it costs money to see those doctors."  (Id.)  He had only recently applied and been approved for health insurance.  (Id.)

        3.  Analysis

    The ALJ found that Plaintiff's condition was "not as severe as he alleges" (AR 17) and that although his "medically

26

determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of [those] symptoms" were not credible to the extent they were inconsistent with the evidence (AR 16). She found that Plaintiff had the RFC to perform a full range of work at all exertional levels, but he was "limited to simple, repetitive tasks with no fast-paced assembly line work, no teamwork, no public contact, and no more than occasional contact with co-workers and supervisors." (AR 15.)

Plaintiff argues that the ALJ failed to give specific, clear, and convincing reasons to support her credibility assessment.[9] (J. Stip. at 16.) The ALJ afforded some weight to Plaintiff's subjective complaints of decreased mental functioning: she limited him to "simple, repetitive tasks," with no fast-paced or assembly-line work, teamwork, public contact, or more than occasional contact with co-workers and supervisors. (AR 15.) As discussed below, to the extent the ALJ rejected Plaintiff's subjective complaints of mental impairment, she provided clear and convincing reasons for doing so.

First, the ALJ noted that Plaintiff had "very limited medical records," suggesting that Plaintiff's "conditions have been managed with little care." (AR 16.) Indeed, as discussed in detail above, the medical evidence does not support

_____

[9] Plaintiff objects to the ALJ's credibility assessment only as to his alleged mental impairment; he does not contest any credibility assessment related to physical symptoms. (See J. Stip. at 16-18.)

27

Plaintiff's allegations of disabling psychological symptoms.  <u>See</u>
<u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005) ("Although
lack of medical evidence cannot form the sole basis for
discounting pain testimony, it is a factor that the ALJ can
consider in his credibility analysis."); <u>Carmickle v. Comm'r,</u>
<u>Soc. Sec. Admin.</u>, 533 F.3d 1155, 1161 (9th Cir. 2008)
("Contradiction with the medical record is a sufficient basis for
rejecting the claimant's subjective testimony.").

Further, the sparse medical record indicates that Plaintiff,
34 years old at the time of the hearing (AR 29), was treated for
psychological symptoms as a teenager but had not sought any
mental-health evaluation or treatment as an adult (<u>see, e.g.</u>, AR
350-52, 360-62).  Plaintiff concedes that he "has not received
treatment from a mental health specialist" but argues that it was
because he was not able to find "free" care and that he had
experienced side effects from his medication as a teenager.  (J.
Stip. at 16, 22 (citing AR 56, 61).)  But the medical evidence
suggests that although Plaintiff experienced some side effects
from his medication as a teenager, when his medication was
changed and he actually took it, he no longer had negative side
effects and his condition improved.  (<u>See, e.g.</u>, AR 360-61
(tolerated medication "without side effects"), 351 (after
medication changed, Plaintiff tolerated it well "without further
side effects"), 402 (Plaintiff's behavior "definitely better"
when he took his medication).)

And as to Plaintiff's failure to seek medical care, when

asked why he had not gone to a psychiatrist in years, Plaintiff told the ALJ that he "just [hadn't] been able to find one." (AR 61.) He noted that he "called a couple numbers" but was told that "it costs money to see those doctors." (Id.) He did not testify as to how much money he was asked to pay or state that he was unable to afford it, only that it "costs money" to see the doctors he called. The ALJ noted that there was "no evidence [Plaintiff] attempted to seek treatment at free or reduced fee county facilities." (AR 17.) An ALJ may rely upon a claimant's unexplained failure to seek treatment as a clear and convincing reason for an adverse credibility finding. See Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (ALJ may discount claimant's testimony in light of "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment"); Orn v. Astrue, 495 F.3d 625, 638 (9th Cir. 2007).

And even if the ALJ improperly considered Plaintiff's failure to seek medical care in her credibility finding — though she noted that she in fact "does not use the possible lack of access to care as a factor against [him]" (AR 17) — any such error was harmless because as explained below, she gave other, legitimate reasons for discounting the credibility of his statements. See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (nonprejudicial or irrelevant mistakes harmless).

Second, the ALJ noted that Plaintiff's scores on his memory

tests "were indicative of poor effort." (AR 17.)  Indeed, both
state-agency consultant Dr. Moura (AR 76) and medical expert Dr.
Dalton (AR 35-36) interpreted Plaintiff's low memory-test scores
as indicative of poor effort.  Although Dr. Marselle may have
found Plaintiff's effort genuine, as Plaintiff notes, the ALJ was
entitled to rely instead on the other two doctors' opinion
evidence on this point.  See Saelee, 94 F.3d at 522.  The
possible unreliability of Plaintiff's test scores was a legally
sufficient and factually supported reason for discounting the
credibility of Plaintiff's statements.  See Thomas, 278 F.3d at
959 (ALJ properly considered claimant's "self-limiting behaviors"
and "efforts to impede accurate testing" during two physical-
capacity evaluations); Tonapetyan, 242 F.3d at 1148 (ALJ properly
considered claimant's poor effort during consultative
examinations).

Third, the ALJ found that Plaintiff's activities of daily
living were "reasonably normal" and inconsistent with his
statements about his severe impairments.  (AR 17.)  At the
hearing, Plaintiff testified that he was able to tend to his
personal care, prepare basic meals, handle money, do household
chores, go to the park to exercise regularly, and ride a bus
independently.  (AR 40.)  He typically spent his day exercising,
watching television, and looking for jobs.  (AR 53-54.)  The
"reasonably normal" daily tasks of keeping a space clean,
maintaining an exercise routine, handling money, seeking jobs,
and preparing simple meals are inconsistent with Plaintiff's

allegation that he would be unable to do "simple, routine tasks" or sustain the level of concentration needed to maintain employment. An ALJ may properly discount the credibility of a plaintiff's subjective symptom statements when they are inconsistent with his daily activities. See Molina, 674 F.3d at 1112 (ALJ may discredit claimant's testimony when "claimant engages in daily activities inconsistent with the alleged symptoms" (citing Lingenfelter, 504 F.3d at 1040)). "Even where those [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Molina, 674 F.3d at 1113; Amezquita v. Colvin, No. CV 15-0188-KES, 2016 WL 1715163, at *7 (C.D. Cal. Apr. 28, 2016) ("That Plaintiff maintained a reasonably normal level of daily activities was a clear and convincing reason to discount his credibility, even if his impairments made those activities somewhat more challenging.").

In sum, the ALJ provided clear and convincing reasons for finding Plaintiff's subjective symptom allegations not credible. Because those findings were supported by substantial evidence, this Court may not engage in second-guessing. See Thomas, 278 F.3d at 959. Plaintiff is not entitled to remand on this ground

## VI.  CONCLUSION

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[10] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.


DATED: June 14, 2017    _____
                        JEAN ROSENBLUTH
                        U.S. Magistrate Judge

---

[10] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."